**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

TRACI HARRIS and ERIC HARRIS, as Parents and natural Guardians of their minor son, C.H., and Individually,

Plaintiffs,

5:26-cv-00654 (BKS/MJK)

v.

GENERAL BROWN CENTRAL SCHOOL DISTRICT; BRIAN A. MOORE, in his official capacity as Superintendent of General Brown Central School District and Individually; DAVID RAMIE, in his official capacity as Principal of General Brown Junior/Senior High School and Individually; and JOSEPH FOLINO, in his official capacity as Assistant Principal and Athletic Director of General Brown Junior/Senior High School and Individually,

Defendants.

---

**Appearances:**

*For Plaintiffs:*
Allen A. Shoikhetbrod
Tully Rinckey, PLLC
1203 Troy-Schenectady Road, Suite 101
Latham, NY 12110

Ashleigh C. Rousseau
Tully Rinckey, PLLC
507 Plum Street, Suite 103
Syracuse, NY 13204

Susan B. Tuchman
Zionist Organization of America
633 Third Avenue, Suite 31-B
New York, NY 10017

*For Defendants:*
Charles C. Spagnoli
Ferrara Fiorenza P.C.

5010 Campuswood Drive
East Syracuse, NY 13057

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs, Traci and Eric Harris, individually and as the parents and natural guardians of their minor child, C.H., bring this action asserting claims arising under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.*, and 42 U.S.C. § 1983. (Dkt. No. 1). Defendants are the General Brown Central School District, as well as Superintendent Brian A. Moore, Principal David Ramie, and Assistant Principal Joseph Folino, each of whom are sued in their official capacity as well as individually. (Dkt. No. 1). Presently before the Court is Defendants' motion for partial dismissal under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 12). Defendants move to dismiss (1) the Title VI claims against Defendants Moore, Ramie, and Folino; (2) the § 1983 claim against the District; (3) any claims asserted by Plaintiffs Eric and Traci Harris in their individual capacities; and (4) the official-capacity claims against Defendants Moore, Ramie, and Folino. (Dkt. No. 12-2, at 11). The motion has been fully briefed. (Dkt. Nos. 12, 17, 18). For the following reasons, Defendants' motion is granted in part and denied in part.

## II. FACTS[1]

General Brown Central School District is in Jefferson County, New York and serves approximately 1,350 students in three schools, including the General Brown Junior-Senior High School. (Dkt. No. 1, ¶ 15). The District receives federal funding and its policies prohibit

[1] The facts are drawn from the complaint. (Dkt. No. 1). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true the legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

discrimination and harassment against students. (*Id.* ¶¶ 16, 148–150). General Brown Central School District Board of Education's Policy 7310 provides that the "Board of Education acknowledges its responsibility to protect the educational climate of the District and to promote responsible student behavior." (*Id.* ¶ 149). Policy 7310(g) further prohibits:

> [D]iscrimination and harassment against any student, . . . by students . . . that creates a hostile environment by conduct, with or without physical contact and/or verbal threats, intimidation or abuse, of such severe nature that: (1) Has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional and/or physical well-being; or (2) Reasonably causes or would reasonably be expected to cause a student to fear for his/her physical safety. Such conduct shall include, but is not limited to, threats, intimidation, or abuse based on a person's actual or perceived . . . national origin, ethnic group, religion, religious practices . . .

(*Id.* ¶ 150). In 2021, C.H., a student at General Brown, started seventh grade. (*Id.* ¶¶ 12, 20).

**A. October 5, 2021 School Bus Incident**

On October 5, 2021, while riding the bus to school, C.H. told a classmate that he celebrates both Chanukah and Christmas. (*Id.* ¶ 21). Plaintiff alleges that the classmate, referred to as "Student K," responded by calling C.H. a "fucking Jew" and stating "that he wanted to put C.H. in an oven and lock him in a shower until he stopped 'knocking.'" (*Id.* ¶¶ 21–22). Student K then physically assaulted C.H. by stabbing him with a pencil and drawing blood. (*Id.* ¶ 24). At some point during the incident, Student K "took C.H.'s phone from him and attempted to view pornography." (*Id.* ¶ 25). Student K then sent C.H. messages that included photographs of Adolf Hitler, Nazis marching and bearing flags with swastikas, and the Star of David. (*Id.* ¶ 26).

The same day, C.H. reported the incident to Assistant Principal Folino, who alerted General Brown's Assistant Transportation Director, Jason Valentin. (*Id.* ¶¶ 28–29). In an email to Mr. Valentin, Assistant Principal Folino summarized the incident, explaining that "two students 'have been bullying [C.H.] in the mornings—specifically making references to him

being Jewish, taking his phone, pushing his way into [C.H.'s] seat, and allegedly at one point [one of the students] stabbed [C.H.] in the leg with a pencil to the point where it drew blood.'" (*Id.* ¶ 30). Assistant Principal Folino did not instruct Mr. Valentin to ensure the students bullying C.H. were separated from him, or to arrange for an alternative transportation arrangement. (*Id.* ¶¶ 32–34). Rather, Assistant Principal Folino told Mr. Valentin that he was "committed to 'address[ing] in on my end,'" and that he "'hop[ed] the bus driver can keep' the bullies 'away from [C.H.].'" (*Id.* ¶¶ 31, 36).

Assistant Principal Folino did not immediately inform C.H.'s parents, Eric and Traci Harris, about the incident, or about C.H.'s report. (*Id.* ¶ 37). Instead, Traci Harris was informed by her son, C.H., and Ms. Harris then contacted Principal David Ramie, who advised her that Assistant Principal Folino "would be contacting her." (*Id.* ¶¶ 38–39). Assistant Principal Folino left Ms. Harris a phone message in which he "assur[ed] her that School officials were addressing the situation, that the bullies would be separated from her son, and that she need not be concerned about retribution because the School would keep C.H. safe." (*Id.* ¶ 40).

**B. Defendants' Initial Response**

The following day, on October 6, 2021, both students that had been reported for bullying C.H. remained on the same school bus. (*Id.* ¶¶ 42, 45). Student K, appearing to retaliate against C.H. following his report, "threatened C.H. to the effect of, 'I will get you back,'" and stated that "he would come to C.H.'s house to put his whole family in an oven." (*Id.* ¶¶ 43, 44). The same day, Eric and Traci Harris spoke with Assistant Principal Folino and expressed their concerns that the School had a "history of downplaying and ignoring bullying incidents." (*Id.* ¶ 45).

On October 7, 2021, C.H. again rode on the school bus with the same bullies present. (*Id.* ¶ 46). Ms. Harris emailed Assistant Principal Folino and again expressed her concern regarding the School's inaction. (*Id.* ¶ 47). Ms. Harris explained that C.H. was experiencing significant

anxiety when going to school and while on the school bus, and stated, "Since when is it okay to call another student a 'fucking Jew' and tell him to get in the oven. This student also sent my child photographs of Hitler, a Swastika, and other derogatory symbols." (*Id.* ¶ 48). Assistant Principal Folino responded, "I am addressing the threat right now. I have made [Principal] Ramie aware. I will touch base with you soon." (*Id.* ¶ 49).

However, Assistant Principal Folino did not "follow[] up with" Traci or Eric Harris regarding any "steps the School was taking to end the harassment." (*Id.* ¶ 50). In fact, Plaintiffs allege that the Defendants "took little to no action" to prevent C.H.'s harassment, "failed to promptly and thoroughly investigate the incidents," and "failed to notify local law enforcement" about the school bus incident. (*Id.* ¶¶ 50–54). At the same time, C.H. was experiencing "severe emotional distress" while at school. (*Id.* ¶¶ 56–57). On October 7, 2021, a teacher noted that C.H. "had a tremendously hard time focusing in class" and that she "hope[d] that the issue [would be] taken care of promptly." (*Id.* ¶¶ 59–60). Still, school officials took no steps "to alert the community to the problem" or to send any "message to students and their families that antisemitism would not be tolerated." (*Id.* ¶ 63).

On October 8, 2021, Eric and Traci Harris wrote an email to then-Superintendent Barbara Case and "emphasized the School's deficient training and policies against antisemitism," explaining that the District "needs to have stricter guidelines and clear cut policies on punitive measures for unacceptable behavior." (*Id.* ¶¶ 68–69). Former Superintendent Case met with Eric and Traci Harris on October 12, 2021. (*Id.* ¶ 70). The Harrises discussed their concerns regarding C.H.'s safety and "how the School had allowed his bullies to remain on C.H.'s bus." (*Id.* ¶ 71). Principal Ramie apologized and noted that "he had not thought that C.H.'s bullies would be on the bus on October 6, 2021." (*Id.* ¶ 72). On October 13, 2021, Ms. Harris emailed the School to

inform them that "C.H. was crying, calling her, and begging her to pick him up from the School." (*Id.* ¶ 74).

Eric and Traci Harris, concerned that their son should "attend[] a school where he would be welcome and safe," chose to enroll C.H. in private school "at considerable financial expense." (*Id.* ¶ 76). C.H. officially began school at Immaculate Heart Central School on October 11, 2021. (*Id.* ¶¶ 78–79). However, due to distress related to "his new environment and lack of friends" at his new school, C.H requested to return to General Brown. (*Id.* ¶ 80).

C.H. began having severe panic attacks and was diagnosed with a severe anxiety disorder and a specific phobia disorder. (*Id.* ¶¶ 75, 83). C.H. had not experienced anxiety or panic attacks prior to the harassment. (*Id.* ¶ 84). Following his diagnosis and return to General Brown, Ms. Harris wrote to Principal Ramie and other school officials regarding C.H.'s "significant anxiety about attending school due to the bullying incident," and explained that, despite C.H.'s treatment and medications, "the thought of going to school is a trigger for severe panic attacks." (*Id.* ¶ 95). Ms. Harris requested that the School "brainstorm ideas in which to help decrease his anxiety and ease him back into classes full time." (*Id.*).

One week following this message, on November 10, 2021, another student told C.H. that "being Jewish is a disgrace to society." (*Id.* ¶ 96). On November 19, 2021, RKA Psychological Services sent a letter to School officials stating that C.H. had been diagnosed and was being treated for disorders caused by the bullying incidents and hostile environment at the School. (*Id.* ¶ 97). On December 17, 2021, students "mocked C.H.'s appearance, particularly poking fun at his weight." (*Id.* ¶ 98). On March 9, 2022, a student deliberately tripped C.H., causing him to hit his head. (*Id.* ¶ 99). Ms. Harris promptly reported this incident to Assistant Principal Folino. (*Id.*

¶ 100). Despite the Harrises' repeated pleas for intervention, the School "continued to fail to protect C.H., and the antisemitic bullying persisted." (*Id.* ¶ 101).

**C. Continued Harassment**

On May 2, 2022, a student made antisemitic comments directed at C.H. during social studies class. (*Id.* ¶ 102). On May 3, 2022, three students made additional antisemitic comments, referring to C.H. as "You Jew." (*Id.* ¶ 103). In a May 3, 2022 email to Eric and Traci Harris, Assistant Principal Folino "minimized" these comments, writing, "I just wanted to reach out and let you know that [C.H.] came down yesterday and reported another student made a rude comment to him in social studies class." (*Id.* ¶¶ 105, 108). Assistant Principal Folino did not inform the Harrises of any "steps the School would be taking to protect C.H." or to prevent further harassment. (*Id.* ¶¶ 108). Instead, school administrators continued to fail to take any actions to implement or enforce the school's policies regarding discriminatory harassment. (*Id.* ¶ 107).

Ms. Harris responded that "[t]hese comments are much more than just being rude and border[] on hate speech," explaining that she understood "[t]he first student had made comments about the KKK prior to targeting [C.H.] . . . [t]he same child prior to spring break yelled out, 'He is a Jew!' while pointing at [C.H.] during social studies." (*Id.* ¶ 109). Ms. Harris added, "I am once again disgusted that the school would refer to anti-Semitic rhetoric comments such as 'Hitler should have been successful' and 'bum *[sic]* all the dirty Jews.' I believe that minimizing complaints and the lack of a clearcut discipline policy (as discussed previously) are to blame for the uprise in bullying." (*Id.*). Again, school administrators failed to identify any steps they were taking to prevent the antisemitic harassment. (*Id.* ¶ 111).

On or around May 5, 2022, "a student held out a book about the Holocaust and pointed and laughed at C.H." (*Id.* ¶ 113). School officials failed to discipline the student and did not

provide any antisemitism education or training to any of the students involved in the incident. (*Id.* ¶¶ 115–16). On April 4, 2023, Student K called C.H. a "Jew" in a "derisive[]" manner. (*Id.* ¶ 118). C.H. reported the incident by submitting a Dignity for All Students Act (DASA) reporting form. (*Id.* ¶ 119). Student K then allegedly retaliated against C.H. by repeatedly following him into the restroom and "menacingly star[ing] at C.H. while he urinated." (*Id.* ¶ 121). Assistant Principal Folino responded to Ms. Harris's concerns by claiming that "the bathroom incident only happened once and was for about thirty (30) seconds." (*Id.* ¶ 123).

On April 25, 2023, Ms. Harris reported to Principal Ramie and Assistant Principal Folino that Student K had "shoulder checked" C.H. and "was present every day in the eighth-grade hallway," although Student K was not an eighth-grade student. (*Id.* ¶ 124). On October 13, 2023, another student pointed to C.H. and stated, "Hey look, there's the fucking Jew," and "called him a 'kike,' an antisemitic slur." (*Id.* ¶ 125). C.H. again reported the harassment to Defendants and completed another DASA report. (*Id.* ¶ 126).

On October 20, 2023 two students exchanged Snapchat messages in which one student threatened to physically assault C.H., stating, "I'll beat that Jew ass." (*Id.* ¶ 127). On October 29, 2023, another student posted antisemitic comments about C.H. on their Snapchat "story," using antisemitic slurs and stating, "I will kill you pussy kyke *[sic]*." (*Id.* ¶ 128). The School was aware of these threatening messages but took no steps to protect C.H. (*Id.* ¶ 129). Rather, the School imposed a three-day out-of-school suspension on C.H. after another student "repeatedly punched him and, in self-defense, C.H. struck back once." (*Id.* ¶ 130). Defendants "acknowledged that C.H. did not strike first and that the School's camera footage showed that the other student was the aggressor." (*Id.* ¶ 131).

On May 23, 2024, Ms. Harris alerted Assistant Principal Folino that a student had made antisemitic comments toward C.H. (*Id.* ¶ 132). The student had called C.H. "a dirty fucking Jew" and stated he "wish[ed] Hitler would come back and kill all of you." (*Id.* ¶ 133). Ms. Harris told Assistant Principal Folino that the student had been making antisemitic comments "for months" and Mr. Folino responded that the offending student "denied the comments." (*Id.* ¶¶ 134–35). Assistant Principal Folino and the other Defendants did not review video surveillance footage, question other witnesses of the incident, or ensure that C.H. was protected. (*Id.* ¶ 136).

On May 28, 2024, Eric Harris emailed Mr. Folino, informing him that C.H. is "in the car in front of the school, afraid to go inside because he's scared some kid . . . is going to attack him." (*Id.* ¶ 139). Minutes later, Mr. Harris emailed Mr. Folino and included Superintendent Brian A. Moore, explaining that the student C.H. feared had been making comments such as, "I will fucking burn you, you stupid fucking Jew" and "I hope Hitler comes back and kills you and the rest of your family." (*Id.* ¶ 140). Plaintiffs allege that the Defendants nevertheless "failed to take the necessary steps" to prevent the harassment and intimidation experienced by C.H. (*Id.* ¶ 144).

In July 2024, Eric and Traci Harris requested an inter-district safety transfer for C.H. (*Id.* ¶ 156). At this point, nearly three years after the October 5, 2021 incident, Superintendent Moore "suggested developing a safety plan for C.H." (*Id.*). C.H.'s parents "sought another school setting for C.H. that would be safe and free from antisemitic hostility." (*Id.* ¶ 158). Defendants allegedly interfered with C.H.'s applications to other schools by furnishing his disciplinary records and history of absences without the "crucial context" that C.H. had experienced antisemitic harassment, threats, and physical assaults. (*Id.* ¶¶ 160–63). The Harrises ultimately enrolled C.H. in a private school. (*Id.* ¶ 164).

On April 9, 2026, Plaintiffs filed a complaint and initiated this case. (Dkt. No. 1). Plaintiffs' complaint asserts two causes of action: (1) violation of Title VI of the Civil Rights Act, 42 U.S.C. §§ 2000d *et seq.*; and (2) deprivation of federal rights under color of state law in violation of 42 U.S.C. § 1983. (*Id.*). Plaintiffs' claims are based on the alleged deliberate indifference and inaction of the General Brown Central School District, its administrators, and employees. (*Id.* ¶¶ 165–95).

## III. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Additionally, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV. DISCUSSION

### A. Municipal Liability

Defendants argue that Plaintiffs have failed to plausibly state a claim for municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) and move to dismiss Plaintiffs' § 1983 claim against the District. (Dkt. No. 12-2, at 5). Defendants assert that Plaintiffs' complaint provides no adequate, nonconclusory allegation showing a policy, practice,

or custom of the district, or failure to train or act of a final policymaker, contributing to the alleged discrimination and harassment. (*Id.* at 5–9). In response, Plaintiffs argue that the complaint sufficiently alleges *Monell* liability under a custom or practice theory of liability and a failure-to-train theory of liability. (Dkt. No. 17, at 9–12).

A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents," and is liable only when it actually deprives, through the execution of its policies, an individual of his constitutional rights. *Monell*, 436 U.S. at 694. "To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019). A municipal policy or custom may be established where the facts show: (1) a formal policy, officially promulgated by the municipality, *Monell*, 436 U.S. at 690; (2) action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84 (1986); (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1988); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).

The parties dispute whether the complaint adequately alleges the third and fourth theories of *Monell* liability.[2] Defendants argue that the allegations of antisemitic incidents were "often far separated by time" and fail to plausibly state a claim under the third theory because they do not

---

[2] Plaintiffs have not disputed Defendants' argument that the first theory does not apply here because there is no allegation of a formal policy contributing to the alleged constitutional violations and the second theory does not apply because the individual defendants were not final policy makers. (Dkt. No. 12-2, at 7–8).

"describe a practice of tolerating antisemitic harassment so persistent or widespread that it may be presumed the board of education was aware of it." (Dkt. No. 12-2, at 8–9). As to the fourth theory, Defendants argue that Plaintiffs provide only "conclusory allegations of failure by the District to train its employees." (*Id.* at 9).

### 1. Widespread and Persistent Practice

To establish a "practice[] so persistent and widespread as to practically have the effect of law," plaintiffs must plausibly allege misconduct that was "sufficiently widespread and persistent to support a finding that [the acts] constituted a custom, policy or usage of which supervisory authorities must have been aware." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012); *see Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297–98 (2d Cir. 2020). In determining whether misconduct is so pervasive as to support an inference of policymakers' acquiescence to the abuse, the Second Circuit has considered the severity and scope of the alleged unconstitutional conduct, *see Lucente*, 980 F.3d at 298; policymakers' actual knowledge of the misconduct, *id.* at 299–300; and evidence of supervisory awareness, *id.* at 301–02.

Accordingly, in *Jones*, the court held that the "[p]laintiff's evidence show[ing] two instances, or at the most three, over a period of several years in which a small number of officers abused the rights of black people" was inadequate to support a widespread practice claim. *See* 691 F.3d at 85. There, the plaintiff also failed to show any "instances in which supervisors were aware of the abuse, or of a high probability of abuse, but failed to take corrective or preventive action" and "no instance in which supervisory personnel exhibited indifference to abuse of the rights of black people." *Id.*

Here, Plaintiffs have alleged that C.H., a junior high school student, suffered repeated and severe antisemitic harassment by other students, and that school administrators took no steps to prevent it. Plaintiffs allege that C.H. suffered a physical assault by a student who called him a

"fucking Jew," stated "he wanted to put C.H. in an oven," and proceeded to send him images of Hitler, Nazi flags, and the Star of David. (Dkt. No. 1, ¶¶ 21–22, 24, 26, 48). Students later told C.H. that "being Jewish is a disgrace to society," (*id.* ¶ 96); that "Hitler should have been successful," (*id.* ¶ 109); and used antisemitic slurs in reference to C.H. (*Id.* ¶¶ 125, 127–28). The antisemitic harassment Plaintiffs allege C.H. faced goes beyond "non-actionable 'simple acts of teasing and name-calling among school children.'" *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 667 (2d Cir. 2012) (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999)). The comments directed at C.H. frequently referenced violence and included "deplorable insults about the Holocaust, one of the worst tragedies in history and an understandable area of sensitivity for the Jewish community in particular." *G.D.S. ex rel. Slade v. Northport-East Northport Union Free Sch. Dist.*, 915 F. Supp. 2d 268, 278 (E.D.N.Y. 2012).

Plaintiffs also assert that supervisory personnel such as Principal Ramie and Assistant Principal Folino "were aware of the ongoing harassment but continually failed to take appropriate action to stop it." (Dkt. No. 17, at 11 ). Principal Ramie and Assistant Principal Folino were notified of the October 5, 2021 school bus incident the same day it occurred but failed to take any steps to separate the bully from C.H. on the bus over the next two days. (*Id.* ¶¶ 29, 30, 41, 46). In May 2022, Assistant Principal Folino referred to a student's statement that "Hitler should have been successful" as mere "rude comments," and administrators did not take any steps to enforce their antidiscrimination policies following the incident. (*Id.* ¶¶ 105, 107–09, 111). School officials were also allegedly aware of antisemitic comments and messages sent by students on Snapchat in October 2023, which included slurs and threats to injure C.H., but took no action to protect C.H. from harm. (*Id.* ¶¶ 127–29).[3] Plaintiffs further assert that "chief

[3] Although Defendants emphasize that "some instances (such as messages sent to C.H. over social media) [took] place outside of the District's control or observation," (Dkt. No. 12-2, at 8), that does not insulate the District from liability.

executive officers of the District knew about the antisemitic harassment," such as Superintendents Case and Moore. (Dkt. No. 17, at 11 (citing Dkt. No. 1, ¶¶ 68, 70, 140–42, 156, 159)).

Defendants argue the incidents alleged by Plaintiffs are too "sporadic[]" to support a widespread and persistent practice theory. (Dkt. No. 12-2, at 8). Defendants emphasize that, although there were at least monthly bullying incidents alleged from October 2021 through December 2021, the post-2021 allegations of specific harassment incidents are separated by several months. (*Id.* (arguing that incidents taking place in October 2021, November 2021, December 2021, March 2022, May 2022, and April 2023 are sporadic) (citing Dkt. No. 1, ¶¶ 28, 43, 79, 80, 96, 98–99, 102–03, 118)). However, viewing the Complaint in the light most favorable to Plaintiffs, the allegations plausibly show a pattern of persistent failures by school officials to respond to antisemitic harassment that amounts to more than a few isolated incidents of abuse. *Cf. Jones*, 691 F.3d at 85. Plaintiffs' allegations that Defendants failed to discipline students involved in antisemitic incidents despite the Harrises' repeated complaints is sufficient to allege a widespread practice from which officials' constructive acquiescence to the conduct can be inferred. *See Winbush v. N.Y.C. Dep't of Educ.*, No. 23-cv-1320, 2025 WL 2624350, at *10–11, U.S. Dist. LEXIS 177361, at *25–32 (S.D.N.Y. Sept. 10, 2025) (finding officials' inaction despite a pattern of racialized bullying against two students was sufficient to show *Monell* liability based on a widespread custom or practice theory).

Defendants note, and Plaintiffs do not respond, that none of the municipal officials who were aware of the harassment or of officials' inaction—*i.e.*, Superintendents Case and Moore,

---

*Cf. Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 184, 194 (2021); *see also id.* at 188 (noting, in a case involving Snapchat, that "[t]he school's regulatory interests remain significant in some off-campus circumstances," which may "include serious or severe bullying or harassment targeting particular individuals").

Principal Ramie, and Assistant Principal Folino—are final policymakers. (*See* Dkt. No. 12-2, at 7, 8 n.2, 9). It is true that Plaintiffs do not allege actual notice by a final policymaker.[4] *See Jones v. Bay Shore Union Free Sch. Dist.*, 170 F. Supp. 3d 420, 438 (E.D.N.Y. 2016) ("[A] Superintendent is subject to the direction and supervision of the Board of Education, and has no vote on Board decisions.") (citing N.Y. Educ. Law § 1711); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion) ("[W]hether a particular official has 'final policymaking authority' is a question of *state law*."). Under New York Education law, "the Board of Education is the final policymaker." *Jones*, 170 F. Supp. 3d at 439; *see also Agosto v. N.Y.C. Dep't of Educ.*, 983 F.3d 86, 101 (2d Cir. 2020) (concluding that "a New York City principal does not have municipal policymaking authority"); *Hurdle v. Bd. of Educ. of City of N.Y.*, 113 F. App'x 423, 427 (2d Cir. 2004) (summary order) (finding a superintendent was not a final policymaker under New York law).

Even so, the Second Circuit has held that "actual notice by the policymakers need not be proven" in order to show that a practice is "so persistent and widespread as to practically have the force of law." *Lucente*, 980 F.3d at 306 (internal quotation marks and citation omitted) (citing *Praprotnik*, 485 U.S. at 127). "[W]here senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980); *see Krulik v. Bd. of Educ. of City of New York*, 781 F.2d 15, 23 (2d Cir.

[4] The Court notes that Plaintiffs allege C.H. completed at least eight Dignity for All Students Act ("DASA") Reporting Forms in response to bullying incidents, (Dkt. No. 1, ¶¶ 119, 146), and that "Defendants are in possession of these reports, (*id.* ¶ 147). However, Plaintiffs do not allege which Defendants were in possession of the reports; which officials are notified as a result of the reports; or what procedures the School or administrators were required to follow in response to DASA reports.

1986) ("[A]n individual official's acts can rise to the level of 'policy' when 'senior personnel' knowingly 'acquiesce' in their subordinates' behavior.").

Plaintiffs have alleged that senior personnel such as the District Superintendent had knowledge of the harassment as early as October 8, 2021, when C.H.'s parents emailed then-Superintendent Case directly to express their concerns regarding the School's lack of response. (Dkt. No. 1, ¶¶ 68–69). The Harrises then met with Ms. Case on October 12, 2021, during which meeting Principal Ramie admitted that he "had not thought that C.H.'s bullies would be on the bus on October 6, 2021," indicating that officials failed to "conduct[] any follow-up" after the school bus incident. (*Id.* ¶¶ 70–73). The bullying continued for nearly three years and escalated to further physical confrontations between students. (*Id.* ¶ 130). The Harrises consistently reported the abuse to senior officials and complained that the School's inaction was inadequate to prevent further incidents. (*See, e.g.*, *id.* ¶¶ 95, 109, 139–42). From these allegations it may be inferred that the Superintendent was aware that Assistant Principal Folino and Principal Ramie had failed to take steps to investigate or appropriately respond to the incidents, and that further antisemitic harassment was likely to occur. (*See also id.* ¶ 156 (Superintendent Moore did not suggest developing a safety plan for C.H. until July 2024)). Thus, drawing all reasonable inferences in favor of Plaintiffs, the Court finds Plaintiffs have stated a plausible claim for municipal liability under the third *Monell* theory.

**2. Failure to Train**

As to the fourth theory under *Monell*, Defendants argue that Plaintiffs' allegations regarding the District's failure to train its employees are "conclusory" and do not rise to deliberate indifference. (Dkt. No. 12-2, at 9). Defendants assert that the Complaint only has one "unsupported general claim of failure to train." (*Id.* (citing Dkt. No. 1, ¶ 192)). Plaintiffs argue, on the other hand, that "Defendants knew and were repeatedly reminded by Plaintiffs that

antisemitism education and training were lacking." (Dkt. No. 17, at 12 (citing Dkt. No. 1, ¶¶ 67–68, 116, 192)).

To show a municipality's failure to train or supervise rises to deliberate indifference, Plaintiffs must plausibly allege (1) that the policymaker knows to a moral certainty that his or her employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the municipal employee will frequently cause the deprivation of a citizen's constitutional rights. *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007).

Because "[i]t is unlikely that a plaintiff would have information about the [municipality's] training programs or about the cause of the misconduct at the pleading stage," plaintiffs "need only plead that the [municipality's] failure to train caused the constitutional violation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004) (Sotomayor, J.); *see also T.J. ex rel. B.W. v. Bd. of Educ. of Mt. Vernon City Sch. Dist.*, No. 17-cv-9592, 2019 WL 13170168, at *12, 2019 U.S. Dist. LEXIS 171583, at *37–38 (S.D.N.Y. Sept. 30, 2019) (finding a plaintiff's failure to allege a "specific deficiency" in the school's training program "at the pleading stage, when plaintiffs have no information about a school's training programs" was not fatal to a failure-to-train claim). Although Plaintiffs are not "relieve[d] . . . of their obligation under *Iqbal* to plead a facially plausible claim," Plaintiffs "can meet their pleading obligations [on a failure-to-train theory] by alleging facts indicating '[a] pattern of constitutional violations by untrained [municipal] employees.'" *Simms v. City of New York*, 480 F. App'x 627, 631 n.4 (2d Cir. 2012) (summary order) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)); *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409

(1997) ("[Policymakers'] continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.").

Here, Plaintiffs allege that "Defendants failed to develop any strategy to stop and prevent antisemitic harassment, bullying, and discrimination," (Dkt. No. 1, ¶ 64); that "Defendants provided no training or educational programs about antisemitism to teachers, staff, or students so that they would be able to recognize antisemitism when it occurred and effectively address it," (*id.* ¶ 67); that C.H.'s parents "emphasized the School's deficient training and policies against antisemitism in an email to [the District Superintendent]," (*id.* ¶ 68); that "Defendants failed to provide adequate training and education to District staff and students about antisemitism, including . . . how to promptly and effectively respond to antisemitism so that it does not recur," (*id.* ¶ 192); and that, "[a]s the result of [these] failures, C.H. was subject to repeated, unrelenting antisemitic harassment," (*id.* ¶ 193).

Plaintiffs' allegations do more than state "a general claim" that the District failed to train its employees. Plaintiffs' allegation that the District "provided no training . . . about antisemitism to teachers, staff, or students so that they would be able to recognize antisemitism when it occurred and effectively address it" identifies a specific gap in District training that was left uncorrected despite repeated incidents, which Plaintiffs allege led to the continued harassment of C.H. (*Id.* ¶ 67; *see id.* ¶ 193). Moreover, Plaintiffs allege a pattern of specific constitutional violations and inaction by municipal employees that, at the pleading stage, may give rise to an inference that the District's training program was deficient. (*See e.g.*, *id.* ¶¶ 29, 30, 46 (failure to separate C.H. from the bully that assaulted him on the school bus); *id.* ¶¶ 105, 107–09, 111

(failure to discipline students that stated "Hitler should have been successful," and minimizing the comments as "rude"); *id.* ¶ 63 (failure to alert the community to the problem or to send a clear message to students and their families that antisemitism would not be tolerated); *id.* ¶¶ 53, 73, 136 (failure to properly or promptly investigate incidents)).

Other courts in this Circuit have found similar allegations sufficient to support municipal liability under a failure-to-train theory. *See, e.g.*, *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 358 (S.D.N.Y. 2014) (summary judgment was inappropriate on a failure-to-train theory where school administrators had notice of numerous instances of antisemitic bullying but failed to take steps to address the harassment); *T.J. ex rel. B.W.*, 2019 WL 13170168, at *12, 2019 U.S. Dist. LEXIS 171583, at *40 (allegations supported a failure-to-train theory where a pattern of sex-based harassment "put the School District on notice of the need for training" and officials "failed to respond"); *A.S. v. City Sch. Dist. of Albany*, 585 F. Supp. 3d 246, 281–82 (N.D.N.Y. 2022) (allegations that "the District failed to train staff about its harassment, discrimination, and retaliation policies and failed to train staff in investigating complaints of discrimination and retaliation" were sufficient to raise a *Monell* claim based on a failure to train).

Addressing only the arguments raised by Defendants in support of their motion, and viewing the allegations in favor of Plaintiffs, the Court finds Plaintiff's allegations at this early stage are not so conclusory that they fail to state a *Monell* claim based on a failure-to-train theory.

### B. Official Capacity Claims

Defendants also move to dismiss Plaintiffs' official capacity claims against Defendants Moore, Ramie, and Folino as duplicative of the District's liability under *Monell*. (Dkt. No. 12-2, at 11). Claims against an individual in his "official" capacity are directed against the municipal entity itself, so allowing claims to proceed against an individual in his official capacity and

against the municipality is redundant. *Petruso v. Schlaefer*, 474 F. Supp. 2d 430, 441 (E.D.N.Y. 2007), *aff'd*, 312 F. App'x 397 (2d Cir. 2009); *Rivas v. Onondaga County*, No. 19-cv-00844, 2025 WL 2675826, at *11, 2025 U.S. Dist. LEXIS 183290, at *28–29 (N.D.N.Y. Sep. 18, 2025) ("The Court also dismisses any official-capacity claims against [the prosecutor] as duplicative of Plaintiff's claims against the [municipality]."). Therefore, the Court dismisses the official capacity claims against Defendants Moore, Ramie, and Folino.

### C. Parents' Individual Claims

Defendants argue that Plaintiffs Eric and Traci Harris cannot bring claims on their own behalf for Title VI violations suffered by C.H. or violations of C.H.'s constitutional rights. (Dkt. No. 12-2, at 10).[5] Defendants are correct that "Section 1983 does not recognize a claim on behalf of one person arising from a violation of another person's rights." *T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, No. 11-cv-5133, 2012 WL 860367, at *3, 2012 U.S. Dist. LEXIS 38500, at *7–8 (S.D.N.Y. Feb. 27, 2012) (citing *T.C. v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 590 (S.D.N.Y. 2011)); *see also HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-cv-5881, 2012 WL 4477552, at *19, 2012 U.S. Dist. LEXIS 141252, at *60 (S.D.N.Y. Sept. 27, 2012). The same is true as to Title VI. *See, e.g.*, *HB*, 2012 WL 4477552, at *18, 2012 U.S. Dist. LEXIS 141252, at *57 ("[Plaintiff-parents] lack standing to assert Title VI claims on their own behalf because they are not beneficiaries of federally-funded school programs."). In their opposition brief, Plaintiffs assert that they may bring claims on their own behalf based on their parental free-exercise rights under the Supreme Court's decisions in *Mahmoud v. Taylor*, 606 U.S. 522 (2025) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). (Dkt. No. 17, at 12–13).

[5] Defendants do not challenge Plaintiffs' authority to assert claims on behalf of C.H. as C.H.'s natural guardians and parents.

In *Mahmoud* and *Yoder*, parents brought an action alleging violations of their rights under the Free Exercise Clause. The Supreme Court has "long recognized the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 486 (2020) (quoting *Yoder*, 406 U.S. at 213–14). Government policies violate parental free-exercise rights when they substantially interfere with a child's religious development and pose a very real threat of undermining the religious beliefs and practices that the parents wish to instill. *See Miller v. McDonald*, 180 F.4th 420 (2d Cir. 2026); *Mahmoud*, 606 U.S. at 546, 530, 550–54 (holding mandatory classroom instruction using storybooks contrary to parents' religious beliefs threatened to undermine children's religious development); *Yoder*, 406 U.S. at 218 (finding a compulsory-attendance law requiring formal schooling after eighth grade would undermine Amish parents' rights to direct religious upbringing of their children).

Defendants assert that, whereas "the laws and practices challenged in *Yoder* and *Mahmoud* bore directly on the religious instruction and upbringing of the children," the Plaintiffs' claim here centers on the harassment of C.H., in violation of his personal rights. (Dkt. No. 18, at 10). Defendants argue that these allegations are therefore insufficient to allege any individual parental rights claims. (*Id.*).

The Court agrees. Plaintiffs' complaint is devoid of allegations regarding any rights of the Harrises that were violated by the Defendants' conduct. (*See generally* Dkt. No. 1). Instead, the complaint repeatedly asserts that Plaintiffs' claims are based solely on violations of C.H.'s rights. (*See, e.g.*, *id.* ¶¶ 181–195 (alleging a § 1983 claim based on discrimination "against C.H.," which "violated C.H.'s constitutional rights" because "C.H. was subjected to repeated, unrelenting antisemitic discrimination and harassment," and "request[ing] judgment in C.H.'s

favor”)). Thus, the Court dismisses any claims by the Harrises in their individual capacities under Title VI or § 1983.

**D. Title VI Claim against Individual Defendants**

Defendants argue that any Title VI claim pursued against Defendants Moore, Ramie, and Folino must be dismissed because “Title VI claims may not be asserted against individuals.” (Dkt. No. 12-2, at 5). Plaintiffs agree that the Title VI claims against the individual Defendants should be dismissed. (Dkt. No. 17, at 8). The Court thus grants Defendants’ motion to dismiss Plaintiffs’ Title VI claim against Defendants Moore, Ramie, and Folino.

**E. Leave to Amend**

Plaintiffs have requested leave to amend to address any pleading failures. (Dkt. No. 17, at 16). Under Federal Rule of Civil Procedure 15(a), absent certain circumstances not implicated here, a party may amend its pleading only with the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(1)–(2). Rule 15(a)(2) requires that a court “freely give[] leave when justice so requires.” *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). But a court may, in its discretion, deny leave to amend “for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.” *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023).

Here, the Court has granted Defendants’ motion to dismiss claims asserted by Plaintiffs Eric and Traci Harris in their individual capacities. Any amendment under Title VI would be futile for the reasons set forth above. Although Plaintiffs have not identified facts that would support an amendment under 42 U.S.C. § 1983, they have not had an opportunity to amend, and the Court therefore grants Plaintiffs’ request for leave to amend the complaint consistent with this decision.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for partial dismissal, (Dkt. No. 12), is **DENIED in part** and **GRANTED in part**; and it is further

**ORDERED** that the claims by Plaintiffs Eric and Traci Harris in their individual capacities under Title VI are **DISMISSED**; and it is further

**ORDERED** that the claims by Plaintiffs Eric and Traci Harris in their individual capacities under 42 U.S.C. § 1983 are **DISMISSED** without prejudice and with leave to amend; and it is further

**ORDERED** that Plaintiffs' Title VI and official capacity claims against Defendants David Ramie, Brian A. Moore, and Joseph Folino are **DISMISSED**; and it is further

**ORDERED** that Plaintiffs must file any amended complaint **within thirty days of the date of this order**. If Plaintiffs fail to file an amended complaint within thirty days of the date of this order, only the claims that have not been dismissed in this order will proceed.

**IT IS SO ORDERED.**

Dated: November 10, 2026
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge